UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

LONDON MILES,

    Plaintiff,

    v.

WYNDHAM VACATION OWNERSHIP,
SHAWYN MALEY,

    Defendants.

Civil No. 12-1288 (JAF)

**OPINION AND ORDER**

Plaintiff London Miles ("Miles") is suing her former employer, Defendant Wyndham Vacation Ownership ("Wyndham"), and her former supervisor, Defendant Shawyn Maley ("Maley") for sexual discrimination, sexual harassment, and a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as well as for retaliation under the same act. (Docket No. 1.) Wyndham filed a motion for summary judgment. (Docket No. 16.) Miles also filed a motion submitting an order and opinion into the record (Docket No. 42), which we note. Upon examination of the record, we deny the motion for summary judgment.

**I.**

**Procedural History**

On April 27, 2012, Miles filed a complaint against Wyndham and Maley. (Docket No. 1.) On August 9, 2012, Wyndham answered the complaint. (Docket No. 7.) On April 15, 2013, Wyndham filed a motion for summary judgment and a memorandum in

support of the motion. (Docket Nos. 16, 17.) On May 14, 2013, Miles filed a response in opposition to the motion for summary judgment, a statement of facts, and an additional statement of facts. (Docket Nos. 22-24.) On May 29, 2013, Wyndham filed a reply to the response to the motion for summary judgment. (Docket No. 34.) On November 7, 2013, Miles filed the opinion and order for a related case that was filed by a fellow employee, Saliceti v. Wyndham. (Docket No. 42.)

## II.

## Facts

When considering a summary judgment motion, we must view all facts in the light most favorable to the non-moving party. Therefore, to the extent that any facts are disputed, the facts set forth below represent Miles' version of the events at issue. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, where Miles' asserted facts do not properly comply with Local Rules 56(c) and (e), we deem Wyndham's properly-supported statements as admitted. See Cosme-Rosado v. Serrano-Rodriguez, 360 F.3d 42, 45 (1st Cir. 2004) (affirming district court's decision to deem moving party's statements of facts admitted if opposing party fails to controvert properly).

Wyndham is a company that provides points-based vacation ownership products via a network of regional offices and sales representatives, and the company has a regional office in Río Grande, Puerto Rico. (Docket No. 16-1 at 1.) Wyndham's Human Resources Director, Lisette Lama ("Lama") is stationed in Pompano Beach, Florida. (Docket No. 16-1 at 2.) At the time of the events in question, Lama received local

support for the Río Grande office from Kerania Olmo ("Olmo"), Assistant Human Resources Director for Wyndham Worldwide, a separate corporate entity that operates the Wyndham Río Mar Hotel. Id. Richard Wieczerzak ("Wieczerzak"), Wyndham's Vice President of Sales & Marketing for South Florida and Puerto Rico, oversees the operations of the Río Grande office. He is stationed in Pompano Beach, Florida. Id.

Miles was born in Puerto Rico and raised in St. Thomas, U.S. Virgin Islands. (Docket No. 16-1 at 3.) In the pre-employment documentation submitted by plaintiff, she identified her race and ethnic origin as Hispanic. Id. On September 10, 2010, Wyndham hired Miles as a Sales Representative at the Río Grande office and gave her a copy of the Wyndham employee manual. Id. The manual stated that Wyndham strives to provide "a work environment free from all forms of harassment based on race, color, age, religion, sex, national origin, disability, or any other legally protected classification." (Docket No. 16-1 at 4.) Further, the handbook stated that employees who witnessed or experienced harassment "should report the conduct to any appropriate member of management, which may include the supervisor, manager, department head, Human Resources representative or the General Manager." (Docket No. 16-1 at 4-5.) When Miles began working for Wyndham, she reported directly to Angelo Sánchez ("Sánchez"), a sales manager who supervised the Río Grande sales representatives. (Docket No. 16-1 at 3.)

On December 10, 2010, Wyndham hired Maley as a sales manager at the Río Grande office. Id. Maley attended numerous trainings. The course names are not topic-specific, other than one entitled "Fair Labor Standards Act (FLSA)," but Lama stated that

1   they are generally employment-related.  (Docket No. 16-4 at 17-19; Docket No. 16-10;

2   Docket No. 16-3 at 2).  On February 15, 2011, Sánchez went on leave and Maley became

3   the direct supervisor for all eight Río Grande sales representatives.  (Docket No. 16-1 at

4   4-5.)  When he was her supervisor, Maley said in front of Miles that she had the perfect

5   breasts and that she had a "nice rack." He also told Miles about sexual relations with his

6   girlfriend, showed her a picture of the girlfriend, and said that he was only with his

7   girlfriend because of her breasts.  On multiple occasions, Maley stared at Miles' breasts.

8   In front of Miles, Maley also said that Puerto Rico was like a little Harlem, that it was

9   fogyish, and that Puerto Ricans have no money.  (Docket No. 24 at 6.)

10          On April 29, 2011, Miles' coworker Michelle Pérez ("Pérez") approached

11  Wieczerzak to complain about Maley.  Pérez told Wieczerzak that a coworker, David

12  Saliceti ("Saliceti"), had said that Maley said the perfect woman had Pérez' ass and

13  Miles' tits.  (Docket No. 16-1 at 5.)  Weiczerzak relayed the information to Lama while

14  the two were on a flight to Florida, and Lama said that she would conduct an

15  investigation.  (Docket No. 16-1 at 5.)  Maley was suspended from employment while

16  Lama investigated the complaint. (Docket No. 16-1 at 6; Docket No. 24 at 5).

17          On May 2, 2011, Pérez and Miles met with Olmo at the Human Resources

18  Department of the Wyndham Río Mar Beach Resort.  (Docket No. 16-1 at 5-6.)  Lama

19  participated in this meeting by phone. (Docket No. 16-1 at 3.)  In this meeting and in her

20  written statement, Miles complained of the following:  (a) that Maley had said that "Luis

21  and Neda have something up their sleeve;" (b) that Maley had referred to Frances Torres

22  as lazy and fat; (c) that Maley said Pegg McGill was a bad secretary; (d) that Maley had

said that Raúl Rivera needed speech therapy because of his poor English; (e) that Maley had said that he hated Angelo Sánchez; and (f) that Pérez told her that Saliceti had mentioned that Maley said that the perfect woman had Pérez' ass and Miles' tits. (Docket Nos. 16-1 at 7; Docket No. 23).  In her written statement, Miles said that "Shawyn seemed to be a fun, caring boss but I have seen changes that scared me.  I am only speaking to protect myself because I know that Michelle Started a HR process where I am involved." (Docket No. 16-1 at 7) (sic).

As part of the company's investigation, Lama also interviewed Pérez, Carmen Planadeball ("Planadeball"), Saliceti, Julio Villaseñor ("Villaseñor") and Maley.  All but Planadeball submitted written statements.  In his written statement, Saliceti mentioned that the comment about the "perfect woman" was made in the presence of several male sales associates.  During the phone interview, he identified Villaseñor as one of those present.  Saliceti further said that Maley had asked him and Villaseñor to help buy marijuana. (Docket No. 16-1 at 8.)  In his phone interview and written statement, Villaseñor denied witnessing Maley making sexual comments and denied being asked to buy drugs.  (Docket No. 16-1 at 8-9.)  In his phone interview and written statement, Maley also denied the harassment allegations.  (Docket No. 16-1 at 9.)  Sánchez had previously approached Wieczerzak to report witnessing harassment by Maley, but he was not interviewed as part of the investigation. (Docket No. 24 at 5.)

The investigation lasted three days.  Id.  Wyndham concluded that it could not substantiate the allegations raised against Maley.  Lama simply counseled Maley on the

proper work environment, company policies and procedures, and advised him as to the company's policy of zero tolerance on retaliation. (Docket No. 16-1 at 9.)

From January 1, 2011 through May 1, 2011, there were twenty-nine discovery tours given on the site. (Docket No. 16-1 at 11.) These are tours of customers who already have a trial ownership product and who, therefore, have an increased probability of purchasing full vacation ownership products. (Docket No. 16-1 at 11.) Sales representatives meeting the minimum standards of performance are placed on a list to lead these tours. (Docket No. 16-1 at 11; Docket No. 23 at 5). Usually, when a sales representative was placed on the list for discovery tours, she remained in it until the end of the month. (Docket No. 24 at 4.) From January 1 through May 1, 2011, Miles was assigned four of the twenty-nine available discovery tours. Six sales were made in total, and none of them were made by Miles. (Docket No. 16-1 at 11.) As of May 1, 2011, about the time of the initial complaint, Miles was generating an average net sales volume of $1,509 per guest. (Docket No 16-1 at 12; Docket No. 23 at 5.) Three days after Miles gave her statement to human resources, she was removed from the list of discovery tours. She notified human resources that she had been removed, but nothing was done. (Docket No. 24 at 4.) Miles was reassigned to "over flow" for discovery tours and to "over flow" for tours of people who already owned a Wyndham product ("Club Wyndham tours"). (Docket No. 16-1 at 11-12.) From May 2 through December 31, 2011, Miles received only one discovery tour (from which she generated a sale), two Club Wyndham tours, and was twice invited to join a party weekend. (Docket No. 16-1 at 12.)

On May 26, 2011, Miles filed a report before the State Insurance Fund Corporation ("SIFC") and, as a result, was placed on rest. The next day, on May 27, 2011, Miles filed sex, race, and national origin discrimination charges before the state Anti-Discrimination Unit ("ADU"). (Docket No. 16-1 at 9.) Upon receipt of the ADU charge, Lama contacted Miles. Miles replied that Lama should contact her attorney. (Docket No. 16-1 at 10.)

By that point, Miles, Pérez, Planadeball, and Saliceti had all filed discrimination charges before the ADU and were all receiving medical treatment before the SIFC. Id. In light of these charges, Lama and Wieczerzak decided to transfer Maley out of the Puerto Rico office. Wieczerzak transferred Maley to a position as a sales manager at the Wyndham Royal Vista Resort in Pompano Beach, Florida, starting July 15, 2011. Id. Miles was released from medical treatment by the SIFC on July 19, 2011, and returned to work shortly thereafter. On or around June 19, 2012, Miles resigned from her position. (Docket No. 16-1 at 12.)

Around the time Miles resigned, other employees had begun legal proceedings. On April 27, 2012, the same day this action was initiated, Pérez filed a complaint for sex discrimination and sexual harassment against Wyndham and Maley. Perez-Rodríguez v. Wyndham, Civil No. 12-1287(GAG); (Docket No. 24 at 3). She complained about the "perfect woman" comment; about a coworker's allegation that Maley told him she needed to have "somebody to fuck her in the ass real good" to alleviate her constipation; and about how Maley "just keeps looking at you like if he can eat you." (Docket No. 24

at 3.)  She also complained that Maley made derogatory comments about Puerto Ricans and African Americans.  Id.

On May 10, 2012, Saliceti also filed a complaint for race and national origin discrimination against Wyndham and Maley, Saliceti v. Wyndham, Civil No. 12-1325 (GAG).  Saliceti claimed that he had witnessed the comment about the "perfect woman," that he had heard Maley refer to African Americans as "fucking niggers" and as deadbeats.  Saliceti claimed that he heard Maley say that Puerto Ricans "have got no money; it's a waste of time, you know, they're on Section 8." He claimed that he heard Maley's anal sex comment regarding Pérez; that Maley would make fun of another coworker for his accent; and that Maley referred to Puerto Ricans as "pigs." (Docket No. 24 at 2.)  Saliceti had previously complained about these comments in a letter to Lama.  Id.

On June 19, 2012, Planadeball filed a complaint against Wyndham for race and national origin discrimination and retaliation.  Planadeball v. Wyndham, Civil No. 2012-1485(JAG).  Planadeball claimed that Maley made jokes about women and Puerto Ricans, and that Maley had said that Puerto Rico was a trash can and that Puerto Ricans were stupid.  She also claimed that she heard Maley refer to African Americans as "niggers." (Docket No. 24 at 7.)

On November 11, 2012, the other sales manager, Sánchez, filed a lawsuit against Wyndham for illegal retaliation in response to his reporting sexual harassment.  Sánchez v. Wyndham, Civil No. 12-1911 (SEC); (Docket No. 24 at 4).

Pegg McGill, another former Wyndham employee, also filed a hostile work environment lawsuit against Wyndham in local court. Pegg McGill v. Wyndham, NECI-2012-00296 (Puerto Rico Superior Court, Río Grande Part); (Docket No. 24 at 7).

## III.

## Legal Analysis

Defendants are entitled to summary judgment on a claim if they can show that there is no genuine dispute over the material facts underlying the claim. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). We must decide whether a reasonable jury could find for Miles in any of her claims when all reasonable inferences from the evidence are drawn in her favor. See Scott v. Harris, 550 U.S. 372, 380 (2007).

**A.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e**

   **1.   Sexual Discrimination, Sexual Harassment, and a Hostile Work Environment**

Under Title VII of the Civil Rights Act of 1964, it is illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1)). Sexual harassment is included as a form of sex discrimination prohibited by Title VII. O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001). Title VII also prohibits "sexual harassment in the form of a hostile or abusive work environment." Rosario v. Dept. of Army, 607 F.3d 241, 246 (1st Cir. 2010); see also Harris v. Forklift Sys., 510 U.S. 17, 21 (1993).

When sexual harassment manifests as a hostile or abusive work environment, the First Circuit has listed several elements a plaintiff must establish in her claim:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

O'Rourke, 235 F.3d at 728.

While Miles cites to several portions and interpretations of the statute, her strongest case for workplace discrimination is that she experienced sexual harassment in the form of a hostile or abusive work environment. Therefore, we walk through the O'Rourke elements which Miles must show to survive summary judgment. See id.

### a.     **Protected class**

Because Miles is a female employee, she has proven this element. See 42 U.S.C. § 2000e-2(a)(1) (prohibiting workplace discrimination based upon sex); O'Rourke, 235 F.3d 713.

### b.     **Unwelcome sexual harassment**

A hostile work environment can be proven by "evidence of sexual remarks, innuendoes, ridicule, and intimidation." O'Rourke, 235 F.3d at 729. Miles alleges that Maley said in front of her that she had the perfect breast and that she had a "nice rack." She also alleges that he told her about sexual relations with his girlfriend, showed her a

picture of the girlfriend, and said he was only with his girlfriend because of her breasts. Miles alleges that on multiple occasions Maley stared at her breasts. (Docket No. 24 at 6.) She also alleges that Maley told another coworker that the perfect woman had Pérez's ass and Miles' tits. (Docket No. 16-1 at 5.) A jury could find that this behavior constitutes unwelcome sexual harassment.

### c. The harassment was based upon sex

In a recent case, the First Circuit found that sexually-oriented jokes which "may not have amounted to much on their own and were of uncertain frequency … nonetheless suggest a lack of respect by [the supervisor] for his female colleagues, lending weight to the inference that his behavior toward [Plaintiff] was inappropriately motived by gender." Rosario, 607 F.3d at 248. The Court emphasized that the supervisor treated other female employees similarly, which bolstered the inference. Id. In this case, Miles' allegations that Maley fixated on breasts certainly suggests a lack of respect by a supervisor for his female colleagues, raising the inference that he was inappropriately motivated by gender. Further, other female employees allege that they were treated in a similarly harassing manner, as evidenced by Pérez's lawsuit for sex discrimination and sexual harassment, Pérez-Rodríguez v. Wyndham, Civil No. 12-1287 (GAG), and by Pegg McGill's lawsuit for a hostile work environment, Pegg McGill v. Wyndham, NECI-2012-00296 (Puerto Rico Superior Court, Río Grande Part). A jury could find that the harassment was based upon sex.

### d. The harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment

To determine whether the conditions are "sufficiently egregious," the court must

> [e]xamine all the attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.

Rosario, 607 F.3d at 247. Although Miles does not specifically state the frequency of the alleged conduct, Maley was only her supervisor for five months and she alleges numerous incidents. (Docket No. 16-1.) Therefore, a jury could find that the conduct was frequent. A reasonable jury could also find that the conduct was severe, humiliating, and unreasonably interfered with Miles' work performance.

### e. The sexually objectionable conduct was both objectively and subjectively offensive

To be both objectively and subjectively offensive, the conduct must be such that "a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). A jury could find that a reasonable person would feel this conduct was hostile or abusive. Further, Miles did in fact perceive it to be offensive, because she complained in both a May 2, 2011, phone call with human resources and in a written statement. (Docket No. 16-1 at 7; Docket No. 23.) She also filed a report before the SIFC and the ADU regarding this conduct. (Docket No. 16-1 at 10.)

#### f. Basis for employer liability

When a supervisor creates a hostile work environment, his employer is vicariously liable. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher, 524 U.S. at 807-08; Noviello v. City of Boston, 398 F.3d 76 (2005). Maley is a supervisor hired by Wyndham. (Docket No. 16-1 at 3-5.)

### 2. Faragher-Ellerth affirmative defense

The Faragher-Ellerth defense "was designed to protect only those responsible employers who have established effective sexual harassment policies and responsive grievance processes." Agusty-Reyes v. Dept. of Educ. of Puerto Rico, 601 F.3d 45, 55 (1st Cir. 2010).

When "a supervisor's harassment of an employee results in a 'tangible employment action against the employee,' the employer is vicariously liable for the actionable hostile environment created by [the] supervisor.'" Agusty-Reyes, 601 F.3d at 53 (citations omitted). Tangible employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Ellerth, 524 U.S. at 761. Reasonableness is not a defense. Agusty-Reyes, 601 F.3d at 53. Miles alleges that she was removed from the list to lead lucrative discovery tours. (Docket No. 16-1 at 11; Docket No. 23 at 5.) However, she implies that this happened in retaliation for her complaint of sexual harassment, rather than as a direct result of the harassment itself. Id.

Because Miles does not allege that the harassment itself resulted in a tangible employment action, the two-part Faragher-Ellerth affirmative defense is available to

Wyndham. This defense requires an employer to show "both (1) 'that its own actions to prevent and correct harassment were reasonable' and (2) 'that the employee's actions in seeking to avoid harm were not reasonable.'" Agusty-Reyes, 601 F.3d at 53 (citations omitted). The policy must, both on its face and as administered, constitute "reasonable care to avoid harassment and to eliminate it when it might occur." Faragher, 524 U.S. at 805.

Wyndham gives its employees a manual stating that it strives to provide a harassment-free work environment, and instructing employees to report any harassment to an appropriate member of management. (Docket No. 16-1 at 3-5). Wyndham also trains its managers on general employment matters, although we do not have specifics in the record. (Docket No. 16-4 at 17-19; Docket No. 16-10; Docket No. 16-3 at 2.) As seen in this case, when Wyndham is alerted to potential harassment, the company interviews employees and collects written statements. (Docket No. 16-1 at 3.) Wyndham suspends the alleged harasser pending determination of the outcome, which can take three days. (Docket No. 16-1 at 6; Docket No. 24 at 5.) Not everyone who reports harassment is interviewed. (Docket No. 24 at 5.) When five employees report harassment, but the alleged harasser and one other employee deny it, the company finds that the claims are unsubstantiated. (Docket No. 16-1 at 8-9; Docket No. 24 at 5.) In response to harassment allegations, the company counsels the alleged harasser on proper work environment, company policies and procedures, and anti-retaliation policies. (Docket No. 16-1 at 9.) Then, Wyndham transfers the alleged harasser to supervise a different

office. (Docket No. 16-1 at 10.) A jury could find that Wyndham's actions to prevent and correct harassment were not reasonable.

Even if a jury did find that Wyndham's actions were reasonable, a jury could still find that Miles' actions were reasonable as well, thus destroying the affirmative defense. Miles met with human resources on May 2, 2011, and submitted a written statement complaining of Maley's behavior. (Docket No. 16-1 at 7; Docket No. 23.) This was less than three months after Maley became her supervisor. (Docket No. 16-1 at 4-5.) Further, Miles did precisely what the employee manual stated an employee should do when experiencing harassment. (Docket No. 16-1 at 4-5.)

**3. Retaliation**

Retaliation under Title VII means discrimination against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To succeed on a claim under Title VII's anti-retaliation provision, a plaintiff must show "that 1) she engaged in protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity." Agusty-Reyes, 601 F.3d at 56-57 (citations omitted).

Miles engaged in protected activity. Protected conduct includes not only formal charges, but also complaints to one's supervisors. Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006). Miles complained to human resources in a meeting on May 2, 2011. (Docket No. 16-1 at 5-6.) She also submitted a written

complaint to human resources. (Docket No. 16-1 at 7.) On May 26, 2011, she filed a report before the SIFC, and on May 27, she filed sex, race, and national origin discrimination charges before the state ADU. (Docket No. 16-1 at 9.)

Miles also suffered a materially adverse employment action. Materially adverse actions include any mistreatment that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). From January 1 through May 1, 2011, Miles was put on a list to lead lucrative discovery tours, and was assigned to four of the twenty-nine tours. (Docket No. 16-1 at 11.) Normally, sales representatives who were placed on the list remained on it until the end of the month. (Docket No. 24 at 4.) However, Miles was removed from the list three days after she gave her statement to human resources. Id. At that time, she was only assigned to "over flow" for discovery tours and Club Wyndham tours. From May 2 through December 31, 2011, Miles only received one discovery tour, two Club Wyndham tours, and participated in two party weekends. (Docket No. 16-1 at 11-12.) This action could well dissuade a reasonable worker from making or supporting a charge of discrimination.

Miles can raise an inference that the adverse action was causally linked to her protected act because temporal proximity can create a "reasonable inference" that an action was motivated by the plaintiff's protected activity. Agusty-Reyes, 601 F.3d at 57. The First Circuit found that a two-week lag between the protected activity and the adverse action created a reasonable inference of causation. Id. Here, because the adverse

employment action occurred three days after the protected conduct, the inference is even stronger. (Docket No. 24 at 4.)

Once a plaintiff has made a prima-facie showing of retaliation, a defendant must give a "legitimate, non-retaliatory reason for its employment decision." Id. (citation omitted). If a defendant provides this reason, a plaintiff must show that the reason is merely pretext, and that the action was instead the result of retaliatory animus. Id. Both Wyndham and Miles agree that Miles was generating $1,509.37 per guest. (Docket No. 16-1 at 11-12; Docket No. 23 at 5.) Wyndham alleges that only sales representatives who made the minimum standard of performance were placed on the list for discovery tours, and that $2,750 per guest was the minimum standard. (Docket No. 16-1 at 11-12.) Miles alleges that $2,750 per guest was the standard for in-house sales persons, but that she was, instead, a front-line salesperson with a quota of $1,509 per guest, which she met. (Docket No. 23 at 5.) If Miles is correct, Wyndham's stated reason is pretextual.

**B.     Other Federal Laws**

Miles cites 28 U.S.C. § 1331, which gives us "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," such as those that arise out of Title VII. 28 U.S.C. § 1331. Miles also cites 28 U.S.C. § 2201, which provides that we "may declare the rights and other legal relations of any interested party," which is not relevant, because Miles prays for monetary relief, rather than a declaration of rights. 28 U.S.C. § 2201. Finally, Miles cites 28 U.S.C. § 2002, "notice of sale of realty," which is not relevant to this proceeding. 28 U.S.C. § 2002.

C.  **Local Laws**

The First Circuit has noted that "the substantive law of Puerto Rico on sexual harassment appears to be aligned with Title VII law; the latter's precedents being used freely to construe the former." Gerald v. University of Puerto Rico, 707 F.3d 7, 28 (1st Cir. 2013). Act No. 115, Puerto Rico's antidiscrimination statute, is also interpreted in line with the national statute. See Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 45 (1st Cir. 2010). Because we find that Miles' federal claims regarding sexual harassment and retaliation survive summary judgment, we find that the state claims likewise survive.

## IV.

## Conclusion

For the foregoing reasons, Miles' motion submitting an opinion and order into the record (Docket No. 42) is **NOTED**. Wyndham's motion for summary judgment, (Docket No. 16), is **DENIED**.

Trial in this case shall be held on **February 18, 2014, at 9:30 A.M.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 24th day of January, 2014.

                                                      S/José Antonio Fusté
                                                      JOSE ANTONIO FUSTE
                                                      U. S. DISTRICT JUDGE